Good morning, Your Honors. May it please the Court. Marilyn Bednarski on behalf of the appellant Charles Yi. I will watch the clock. I'd like to reserve three minutes for rebuttal and I understand it's my responsibility. Yes, it is. Absolutely. There's an issue in this case regarding the instruction that was given on willful blindness and there's issues regarding sentencing. First, I'm going to address willful blindness. I believe that the instruction that was given was legally erroneous. It was in the context of this case also harmful error. The problem with the instruction really comes in the second paragraph and it's the very last clause. It's the clause in which the court instructed the defendant was simply careless. The reason why I believe that that is so erroneous is that it allowed the jury to convict on less than the mens rea required. The willful blindness instruction essentially replaces intent with deliberate avoidance and by that it's a shorthand for there's two of course requirements, both high probability of the illegal fact but also deliberate avoidance. Counsel, put this in the context of U.S. v. Heredia. I will. In Heredia, which of course was a 2007 case, the court decided that the instruction given in that criminal trial was appropriate and what they were dealing with was not the simply careless language but they were dealing with two other things that were the substance of that decision. One was to get rid of the third prong, which was the motive prong. The second was to set forward an abuse of discretion standard. There's some language in there about this simply careless but it's not the substance of the opinion and it's really dicta in that sense. The problem that I think that language introduces is I think ironically that clause was intended to protect defendants from being convicted based on negligence or maybe even recklessness but it doesn't do that when it says simply careless because simply careless is less than careless. It's like saying I have a simple cold, not a severe cold, not a complex cold, not a cold with a sinus infection, just a simple cold. It's less than what we know is legally insufficient. In other words, if that second clause says to the jurors, you cannot convict or the second paragraph, you cannot convict if you find that he actually knew. You also cannot convict if you find he was simply careless. There's a gray area in between those two that that clause simply careless brings into the instruction. It actually introduces the very notions and the very possibility that you can be convicted based on negligence, which is more than simple carelessness or simple negligence, or even on recklessness. And that's why I say it's ironic that the language I think that was put in there hopefully to protect the defendant from being convicted on less than the statute requires, that is knowledge, actually introduces that possibility. Do you have a case that says that including that language is wrong? I don't, but if you look at Global Tech, which was the Supreme Court's 2011 case, it was in that case the litigant didn't challenge the actual language, but the court in some respects addresses it and finds that the language, that they would not consider the flaws in the language, but they do address this concept that negligence is not enough and recklessness is not enough. In other words, you cannot supplant the knowledge requirement with what is less than what the statute requires. That problem is even greater in our case where we have what is essentially very close to a strict liability offense. No knowledge of illegality was required to convict, only knowledge that asbestos existed. So it makes it very dangerous in our case because ordinarily I would say the motive to avoid being caught for something often supplies a reason to deliberately avoid or it supplies a context in which a jury can understand deliberate avoidance. We don't have that because the statute under the Clean Air Act does not require knowledge of illegality. All it requires is knowledge of asbestos. So essentially what happened is this instruction that was given with simply careless language allowed a jury to convict based on Mr. Yee's failure to read documents that came into his, not into his direct possession, but into the possession of the company and his project manager who kept these documents in his office, the Phase I's, the O&M plan. And it essentially allowed the jury to convict him for not reading. And not only was it... It also allowed them to convict for playing ostrich, putting your head in the sand and not wanting to know what may be out there? First of all, I think the evidence did not support suspicion at the time the decision to scrape was made, 15 months after those documents. But to address your comment directly, it also did not support that there was deliberate avoidance because as the cases say, deliberate avoidance is an active act. It's an intentional act. It's not something that happens passively. And so when you have an act that simply involves not reading something, which was normal in the context of his business because his focus was on financial. And the way he had his company set up was to have other persons in charge of things. So are you saying that the deliberate indifference or deliberate ignorance instruction as such should not have been allowed? I'm saying, yes, that the court abused its discretion in giving it because the evidence wasn't sufficient, but also that it was legally... What about the Uint testimony on the contract bids, the defendant's own testimony with respect to his own suspicious of asbestos being in the project? It seems to me there's a lot of evidence. And what he said was that he was suspicious when they first went to purchase the property and he walked around with his sister. He could see that the buildings were old and that there was a lot of evidence. And he gave him that suspicion. He did not have that suspicion 15 months later after three things happened, two of which were completely independent tests that he didn't solicit, one of which was done by John Canepa's company and he was the wrap insurance man who was touring the property and who on his own offered to test the ceilings. Mr. Yee didn't even know about that. The test results, in fact, came back and were communicated by Mr. Canepa to Mr. Yee's two very experienced project managers. First of all, Mr. Bostick and Mr. Laveau, who combined had decades of experience, and were then communicated to his direct project manager, Mr. Yoon, who was the guy who really covered the details of moving a project forward. The way the details were communicated to Mr. Yee were that the sample was negative and it was okay to scrape. There was contrary testimony from Mr. Laveau, who said he recalled actually showing Mr. Yee the lab report. The lab report said one percent. But that's a red herring because the way it was communicated to him was that the ceilings were okay to scrape and that the test results were negative. There was a variation on that where Sherry Hill, who was a co-owner, testified that the way she heard it was that the test results were normal. Mr. Yoon, who was the project manager, also corroborated that he told his boss they were negative and okay to scrape. So at the time, the decision was made to scrape. That decision was not made by Mr. Yee in any kind of superior or isolated way. It was made by Mr. Bostick and Mr. Laveau, along with Mr. Yoon, who were actually on site. Mr. Yee, who was really the financial man in the company whose offices were miles and miles away, and which company dealt with probably, I think Mr. Yee merely acquiesced in their advice to scrape, but Mr. Yee didn't make that decision. So I think it's critical to look at the time period, and I guess the question is whether you find it a mere failure to read constitutes a deliberate act 15 months later in the context of the decision after having two independent tests, one I told you about by Mr. Canepa, another one by a homeowner. Isn't this, I'm sorry to interrupt, a classic case for the jury where you have competing facts, competing inferences, his awareness when he purchased the property, his opportunity to have an environmental review when he purchased the property, his knowledge of the popcorn ceiling, and your attempts to distance him from any hands-on involvement in the case with other inferences that came out in the testimony that didn't really have him so far away, whether it be in miles or in involvement. Isn't this really just a classic case for the jury to decide whether the government has met its burden of proof? Well, one thing is I believe when you have evidence that seems to undercut or contradict a defendant's testimony, that's not simply evidence of deliberate avoidance, but it merely is evidence of direct knowledge. In other words, the competing evidence that you're talking about, whether Mr. Laveau told him there's asbestos, it's just a small amount, or whether Mr. Laveau and others said it's negative, that might undercut or contradict Mr. Yee's testimony that he was told it was negative and it was okay to scrape, but it doesn't in and of itself constitute evidence of deliberate avoidance. We keep coming back to this question of what did he do actively or intentionally to avoid knowledge, and there's nothing. They did nothing to hide it. It was completely open, and there's repeated references in the record to that. I see I only have three minutes. Can I address the sentencing issue, which is so important? Absolutely. You control the total time. Okay. All right. The court, I have a dispute with ten levels that were added to the base offense level. There are some other enhancements that I don't have a dispute with. The two I have a dispute with are role and substantial risk of serious bodily injury or death. First of all, is it clear there were five players in this so that you come under that? That's not an issue. That's not an issue. Okay. With respect to the substantial risk of death or serious bodily injury, we proffered to the court an expert by way of his report, his declaration, and also an oral proffer I made at the time of sentencing, all of which evidence was not contradicted and established that the type of asbestos involved here was different than what was involved in Pearson, not the substance in Pearson at all, that the substance that was involved in Pearson was a type of asbestos, and it has two completely different names, those amosite and crucidolite. Rather in our case, the type of asbestos involved didn't involve either of those, and Mr. Daly's testimony and reports and evidence showed that our type of asbestos was structurally so different that it behaved differently in the body. It didn't attach to the lungs. It was expelled readily. Half of whatever would be breathed would be expelled on the first day after any exposure. Half of that on the next day, half of that on the next day. Here's my problem. Okay. The district judge considered that expert. He did not. He did. He considered it. He didn't ignore it, but he didn't give it the weight that you want us to give it, and he did that in part, at least, because he was giving medical opinions, as you now are, but didn't have a medical degree. I completely disagree, respectfully. Isn't that what the district judge did? You're disagreeing with that approach? No. I disagree because his comments on the record show that he did not consider that expert. First of all, there are the comments in which he replaced his own opinion of what was a more appropriate type of expert. I've cited case law in my brief, both Paoli and there's other cases to say a court can't do that. Secondly, he made a generalized statement that merely repeated language from Pearson about state and federal governments recognizing asbestos as a health hazard and generally accepting exposure can cause life-threatening diseases. Thirdly, because he merely repeated language from the PSR, which again cited to Pearson, and I cite you in this respect to PSR paragraphs 31 and 32, which the court merely repeated in its findings in the transcript of sentencing at pages 24 and 25. These comments in these three areas show that he didn't consider them. It's not a question of weight. He replaced him with his own idea that there should have been a medical doctor or a molecular biologist, neither of which would have any idea of how asbestos works in the workplace, what a cleanup site means, how it works in terms of the atmosphere or being breathed in or masks or any of the other issues, wet methods or anything else. Secondly, he just summarily adopted language from Pearson when the facts of our case were not Pearson facts. In fact, the evidence showed they should never, Pearson didn't apply at all. It was old science. It was from 2001. There was no evidentiary hearing in that case and no expert. We simply had a completely different set of facts. Thank you, counsel. Your time has expired. We will now hear from the government. It said a minute on here. Is that wrong? That was a minute overtime. Oh, I think the last lawyer made that same mistake. Exactly. I complained to the management here for years about that, but they're unable to stop the clock at zero. It keeps on going, but then it's amount of overtime. Sorry, counsel. May it please the court. John Arbab for the United States. Mr. Arbab. I think it might be the best use of my time, which I'll try not to run out the clock on, to go right to the main points that counsel just brought up before the court. First of all, I think her main argument on the instruction, on the jury instruction, was that somehow this court's model jury instruction on deliberate ignorance, which is what the district judge gave here, is legally erroneous. Something less than a model, apparently. Well, it seems hard to understand how giving a model instruction could be substantively erroneous because in Heredia, the court approved this model instruction, and that is what the district judge said, I'm going to give. We cited the place in the transcript where the evidence supported giving this instruction, particularly given what I heard the defendant testify to when he took the stand. But I'm going to go back, I'm going to check Heredia, I'm going to make sure that the proffered instruction is the one that was approved in Heredia, and if I am satisfied that that is so, I'm going to give the instruction. And that is precisely what happened. Now talk about her second argument, which is the application in this case was wrong. Yes, Your Honor. Well, I think the argument is that even assuming that the instruction is legally correct in substance, that the judge abuses discretion in giving it in this case because there was insufficient evidentiary basis for giving the instruction. And I think that that is just not true. I can give you sort of a small laundry list of the evidence that's more thoroughly discussed in the brief, but the first prong is suspicion. And the defendant himself got on the stand and said, yes, I suspected that there was asbestos in these ceilings because of the age of the building. He knew that it was built in around 1970, when using this material was quite common apparently, at least in this area. There was evidence that he knew that his suspicion rose to the level of a high probability that there was asbestos in the ceilings because his own sister, Sherry, said that on the walkthrough they discussed these ceilings, which they were both, both she and the defendant were looking at. And they could tell because they were the popcorn variety, so-called. They just assumed that there would be asbestos in there because it was popcorn ceiling and because the building was of that age. And so they both agreed not to touch the ceilings because they knew that if they did touch the ceilings, they'd be disturbing asbestos. As to deliberate avoidance, I tried to pick out sort of my top three of, if I had been on this jury, what would have impressed me. I think it's sufficient evidence from which a rational jury could find deliberate avoidance and not just carelessness or whatever. First of all, already suspecting, as I just mentioned, already suspecting asbestos in the ceilings, the defendant is handed the due diligence binder for the property by Mr. Yoon. And he doesn't look at the most obvious parts of the binder, the part that has the environmental reports in it. He just looks at other parts of the binder, ignoring the environmental reports, which are the, we talk about the Dames and Moore report and the so-called EBI consultants report. All of which said, there's a range of 3 to 12 percent asbestos in these ceilings. The defendant, already suspecting asbestos, is handed this binder and he doesn't look at the most relevant parts. And there's also evidence that it's not like these reports were buried in some massive binder. The environmental material was like 50 percent of the binder. So it was quite clear he's an experienced businessman. He's had asbestos issues in many other projects. He would know that the due diligence binder would confirm or disconfirm his suspicions. He just didn't look at the binder, at least not the relevant parts. Also, to me, I thought it was quite powerful that the government showed that already suspecting asbestos in the ceiling, the defendant told one of his other employees named Paul Policarpio to do an assessment. The testimony was, quote, of the parts of the due diligence package that had to do with the physical condition of the building, including environmental. And Policarpio and Yoon made such a report. It was a one-page, very easily readable summary. I think it was styled at the top, Paul Policarpio's Discoveries. And the testimony was that Yoon handed this one-page document to Yee, but apparently he never read the one-page document that the defendant himself directed his subordinates to go out and create for him. And the documents in the record, the one-pager at Government's Excerpt 671, it says the reports in the binder show that there's asbestos in the acoustical ceilings at Forest Blend. And the third thing that I thought was pretty persuasive, I think a rational juror could have also on this, again, already suspecting asbestos, the defendant relied on a single test result. This is the one taken by Mr. Canepa that Ms. Bednarski referred to. It was a single test result. And really, whether it was negative for asbestos or 1% for asbestos, the important point is that the defendant is an experienced businessman. There was testimony in the record that you do not rely on one single sample to make a determination about whether you have an asbestos problem in your property or not. Many samples have to be taken. I think maybe the most powerful testimony was when one of his employees, former employee Stacey Haw, testified about a project going on at around the same time in 2005 called Fedora, where Millennium paid for 144 samples to be taken at the Fedora project, which actually only involved three buildings. I mean, here, Forest Glen was something like 18 buildings. So one would expect quite a lot more than 144 samples to have been taken. But just one sample was taken. I would like to make sure you have enough time to address the two enhancements, so I would like to get to the two enhancements that have been challenged. Sure. Your Honor, let me just, I'll move away from the instruction point just to point out one other thing, which is that even if the court were to conclude that the district court judge abused his discretion in giving a legally correct instruction because the evidence didn't support giving the instruction, still under this court's case law, that error was harmless because the evidence of actual knowledge of asbestos in the ceilings was overwhelming, and that's this court's standard. And in our brief, we, again, provide quite a long list of the evidence from which a rational juror could have found actual knowledge and in the You don't have a jury finding, do we, on which it was that they would have found? No, Your Honor, but that's not a problem as long as the evidence of actual knowledge was overwhelming. And in the reply brief, I take it to be a concession that because there's no discussion of why the government's evidence of actual knowledge was insufficient, not sufficiently overwhelming, or whatever. That's just ignored in the reply brief, so I think that's more or less a concession that any error here on this instruction was harmless. In terms of the sentencing enhancements, let me just, I think the main one that counsel focused on here was the serious bodily harm enhancement. Oh, let me just briefly, I think I have enough time to address both of them. First of all, tell me why there's clear and convincing evidence given what she's pointed out, that there's lack of a government expert, that perhaps the district judge didn't give appropriate credence to the defendant's expert, reliance on Pearson, which is outdated. Is that clear and convincing? Your Honor, first of all, Pearson is not outdated. It's the law of the circuit. I think it's a pretty tough argument to make that the district court abused its discretion or committed an error in some sense when he's relying on circuit precedent that appears to apply to this case. An important, I think counsel mentioned that Pearson really was not, was factually different from this case, but to me the important point about Pearson in terms of facts is that the facts of this case are more egregious in terms of the way people were exposed to asbestos as a result of this improper scraping of the ceilings. I mean, in Pearson, at least the protective requirements for workers, Pearson refers to the fact that the defendant in that case had set up a so-called negative air pressure containment around the site. It turned out that it didn't really work properly, but at least that was there. Pearson also says that the workers wore respirators. I mean, there was some effort on the part of that defendant to protect the workers. Here there was nothing of that nature, and it's also not true the point about outdated science. First of all, let me mention the defense expert, Mr. Daley. As we discussed in the brief, and I don't think counsel really addressed it here, controverted what we say in the brief, but Daley was expressing opinions based on facts that were contrary to those proved at trial. The main one was that, in Daley's view, this enhancement shouldn't apply because the workers were wearing respirators when they were, over the three weeks or so time that they were scraping the ceilings. That's just not, that doesn't square at all with the testimony. It's not a question of there being a dispute on this issue. All the while, Palacios, the hapless fellow whose crew, he and his crew were doing the illegal scraping, he just said we were wearing regular clothes, regular street clothes, jeans and t-shirts. To the extent that there was any breathing protection, the testimony was it was just white paper dust masks that are completely ineffective when you're dealing with airborne asbestos fibers. Daley also made his, offered his opinion based on supposedly the ceilings being scraped while wet. That's only partly true. When they were actually doing the scraping, the testimony was they wetted the ceiling because that made it so much easier to get the popcorn off the ceiling. But the part that Daley was missing was what happened after the stuff fell down. It was not kept wet, as the regulations required, while on the ground. It was not kept wet and put into properly sealed containers while wet. None of that happened. The testimony, especially from Mr. Israel, the inspector, the state inspector, was that this was one of the worst things he'd ever seen in 24 years. The stuff was this is one of the worst in 24 years of my experience, quote, by numbers and amounts of material that was involved, condition of the material, type of material, the fact that it was basically everywhere on public walkways, sidewalks, driveways and dumpsters. And as I said, Palacios and his men were working in this stuff for at least three weeks. So the district judge on this kind of a record, I think, was well within his discretion to say that Daley's testimony on this enhancement was entitled to little or no weight. It's also not true that the government was relying on outdated science. We point out in the brief and provide in the excerpts the letter from Julie Robel at APA Toxicology's. In that letter, she specifically addresses the notion that distinctions ought to be made between different types of asbestos. The one that issue here is called chrysotile, I believe. And she makes the point that in the judgment of EPA, there isn't a solid enough scientific basis to make judgments dividing up the types of asbestos to say this one's not so bad, this one's sort of bad, and this other type is really, really bad. They're all carcinogenic. That's right. And the regulation, which is included, I think, at addendum 8, includes all of them. Can I ask you to address the role of the leader, please, before your time runs out? Yes. I have a little bit of time left, Your Honor. Did the district judge do an improper but-for analysis? No, Your Honor. I think that, as we point out in the brief, that was a comment that the judge... An unfortunate comment. No, I don't think so, Your Honor. It was in response to an argument the defense counsel was making at the sentencing hearing. I think really the point the judge was trying to make was the defendant's role here went beyond being a but-for cause. In terms of tort law, I would say that the defendant here was the proximate cause of the illegal scraping. And when you're the proximate cause, when you're, as the judge said, the person who did it, you're much more the proximate cause of the illegal activity that happened. You're not just, you know, like in some cases there's a translator who provides assistance or there's another participant, like in another case, who knew more about how ATMs worked. The buck stopped with him, then? That's true. And that certainly supports, I believe, the notion that the defendant is a leader or organizer. I think that, as a practical matter, it's pretty clear, I think, that he was responsible for organizing others, which is one of the ways of showing that enhancement under this Court's case law. I mean, he organized Yoon and Palacios and Palacios' work group to do this. Thank you, counsel. The case just argued will be submitted for decision, and the Court will adjourn.
judges: Zouhary, Goodwin, O'Scannlain